**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BARRY KING, derivatively on behalf of ENERGY TRANSFER LP, <br><br>     Plaintiff, <br><br>     vs. <br><br> LE GP, LLC, KELCY L. WARREN, THOMAS E. LONG, JOHN W. MCREYNOLDS, MARSHALL S. MCCREA, III, MATTHEW S. RAMSEY, STEVEN R. ANDERSON, RICHARD D. BRANNON, RAY C. DAVIS, MICHAEL K. GRIMM, K. RICK TURNER, RAY W. WASHBURNE, and WILLIAM P. WILLIAMS, <br><br>     Defendants, <br><br>     and <br><br> ENERGY TRANSFER LP, <br><br>     Nominal Defendant. | Case No.: 3:20-cv-00719 <br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED UNITHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Barry King ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Energy Transfer LP ("Energy Transfer" or the "Company"), files this Verified Unitholder Derivative Complaint against Defendants Kelcy L. Warren, Thomas E. Long, John W. McReynolds, Marshall S. McCrea, III, Matthew S. Ramsey, Steven R. Anderson, Richard D. Brannon, Ray C. Davis, Michael K. Grimm, K. Rick Turner, Ray W. Washburne, and William P. Williams (collectively, the "Individual Defendants") and Defendant LE GP, LLC ("LE GP" or the "General Partner," and together with the Individual Defendants, the

1

"Defendants") for Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Energy Transfer, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a unitholder (i.e., shareholder) derivative action that seeks to remedy wrongdoing committed by LE GP and its officers and directors that caused damage to Energy Transfer between February 25, 2017 through the present (the "Relevant Period").[1]

2.      Energy Transfer is a natural gas and oil services company based in Dallas, Texas. The Company's business activities, which are conducted throughout the U.S., include maintaining and operating multiple natural gas and natural gas liquids ("NGL") pipelines and storage facilities.

3.      Specifically, the Company's operations consist of inter/intrastate natural gas transportation and storage, NGL transportation, storage, and fractionation services, crude and refined oil transportation, and terminalling, acquisition, and marketing activities. Energy

---

[1] Because Energy Transfer is a limited partnership, shares of the Company's equity, which are publicly traded, are referred to as units. Accordingly, holders of these units are referred to as unitholders, rather than shareholders.

Transfer conducts these operations through its subsidiaries, which include Energy Transfer Operating, L.P. ("ETO") and Sunoco LP ("Sunoco").

4.      Energy Transfer is organized as a Delaware limited partnership, and the Company itself functions as an operating subsidiary of Defendant LE GP, the Company's general partner, which manages, directs, and controls all of Energy Transfer's activities. According to the Company's SEC filings, Energy Transfer does not have officers or directors—instead, it is managed by the Board of Directors (the "Board") and executive officers of the General Partner. Consequently, "the executive officers of [the General Partner] are [Energy Transfer's] executive officers." *See* Company's annual report filed with the SEC on Form 10-K on February 22, 2019 (the "2018 10-K"). The General Partner's "directors and officers have fiduciary duties to manage [Energy Transfer's] business in a manner beneficial to [Energy Transfer] and [its] Unitholders."

5.      In connection with the Company's operations, the Company owns approximately 21,600 miles of intrastate and interstate natural gas transportation pipelines, which are among the largest natural gas transportation systems in the U.S. Energy Transfer also owns and operates three natural gas storage facilities located in Texas.

6.      One of the Company's major pipeline systems is the Mariner East Pipeline, a nearly $3 billion NGL pipeline project extending across Pennsylvania and through parts of West Virginia and Ohio. The first phase of the Mariner East Pipeline, Mariner East 1, began operating in 2014.

7.      To date, the construction of the Mariner East Pipeline has not gone smoothly. The construction process has resulted in a number temporary shutdowns of the pipeline as well

as millions of dollars in fines imposed by state regulators, and has spurred lawsuits and protests from environmental advocacy groups and landowners.

8.     On February 13, 2017, the Pennsylvania Department of Environmental Protection ("PDEP") approved construction permits for Mariner East 2, the second phase of the Mariner East Pipeline, which would extend the pipeline to the Delaware River. Shortly thereafter, construction began on Mariner East 2, which eventually became operational in December 2018.

9.     During this period of time, the Defendants, acting independently or in concert with Pennsylvania Governor Tom Wolf's ("Governor Wolf") administration, had secretly made use of coercion, bribery, and/or other illicit means of forcing PDEP to approve the permits that were vital to continuing the construction of the Mariner East Pipeline.

10.     On November 12, 2019, the *Associated Press* issued a report on its website titled, "FBI eyes how Pennsylvania approved pipeline" (the "AP Report").[2] The AP Report revealed that the FBI had begun investigating Governor Wolf's administration for corruption, in order to determine whether the administration had forced PDEP officials to approve Energy Transfer's construction permits.

11.     On this news, the price of Energy Transfer's units fell over the course of two trading sessions, from $11.97 per unit at the close of trading on November 11, 2019, to $11.16 per unit at the close of trading on November 13, 2019, a loss of approximately 6.77% in value.

12.     During the Relevant Period, the General Partner and the Individual Defendants breached their fiduciary duties to Energy Transfer by allowing the Company to utilize permits that were obtained through the use of coercion, bribery, or other improper methods, and by

---

[2] https://apnews.com/ffd3c53d855445cebfd0d5148b3860fa (last visited December 5, 2019).

personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and legal and regulatory compliance. Specifically, the General Partner and the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the construction permits issued by PDEP in connection with the Mariner East Pipeline were obtained by the Company through the use of coercion, bribery, or other improper methods; (2) the use of these illicit methods increased the risk that the Company would be subjected to material investigations and/or litigation commenced by government authorities; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     Furthermore, the General Partner and the Individual Defendants breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

14.     Also in breach of their fiduciary duties, the General Partner and the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     In light of the General Partner and the Individual Defendants' misconduct, which has subjected the Company, the General Partner's Chief Executive Officer ("CEO"), the General Partner's Chief Financial Officer ("CFO"), and the General Partner's former President and a current director to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement

adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the General Partner and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by Defendant LE GP, and of the substantial likelihood of LE GP's liability in this derivative action and in the Securities Class Action, and of it not being disinterested and/or independent, LE GP cannot consider a demand to commence litigation against itself and its officers and directors on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this

District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

23.     Venue is proper in this District because Energy Transfer and the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current unitholder of Energy Transfer. Plaintiff has continuously held Energy Transfer common units at all relevant times. Plaintiff is a citizen of Lewisburg, Pennsylvania.

### Nominal Defendant Energy Transfer

25.     Energy Transfer is a Delaware limited partnership with its principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225. Energy Transfer's common units trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."

### Defendant LE GP

26.     LE GP is the general partner of Energy Transfer.

27.     Energy Transfer and LE GP are governed by the Company's Partnership Agreement. Per the Partnership Agreement, the General Partner conducts, directs and manages all activities of the Company. All management powers over the business and affairs of the Company are exclusively vested in the General Partner.

**Defendant Warren**

28.     Defendant Kelcy L. Warren ("Warren") is a co-founder of the Company, and has served as the General Partner's Chairman and CEO since 2007. He is also the majority owner of the General Partner. According to the Company's annual report on Form 10-K filed with the SEC on February 21, 2020 (the "2019 10-K"), as of February 14, 2020, Defendant Warren beneficially owned 252,037,063 of the Company's common units, which represented 9.4% of the Company's outstanding units as of that date. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Warren owned approximately $3.2 billion worth of Energy Transfer units.

29.     The Company's 2019 10-K stated the following about Defendant Warren:

*Kelcy L. Warren*.  Mr. Warren serves as Chairman and Chief Executive Officer of our general partner. He was appointed Co-Chairman of the Board of Directors of our general partner, effective upon the closing of our IPO, and in August 2007, he became the sole Chairman of the Board of our general partner and the Chief Executive Officer and Chairman of the Board of the general partner of ETO. Prior to that, Mr. Warren had served as Co-Chief Executive Officer and Co-Chairman of the Board of the general partner of ETO since the combination of the midstream and intrastate transportation storage operations of ETC OLP and the retail propane operations of Heritage in January 2004. Mr. Warren also served as the Chief Executive Officer of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Prior to the combination of the operations of ETO and Heritage Propane, Mr. Warren served as President of the general partner of ET Company I, Ltd. the entity that operated ETO's midstream assets before it acquired Aquila, Inc.'s midstream assets, having served in that capacity since 1996. From 1996 to 2000, he also served as a Director of Crosstex Energy, Inc. From 1993 to 1996, he served as President, Chief Operating Officer and a Director of Cornerstone Natural Gas, Inc. Mr. Warren has more than 30 years of business experience in the energy industry. The members of our general partner selected Mr. Warren to serve as a director and as Chairman because he is ETO's Chief Executive Officer and has more than 30 years in the natural gas industry. Mr. Warren also has relationships with chief executives and other senior management at natural gas transportation companies throughout the United States, and brings a unique and valuable perspective to the Board of Directors.

30.     Upon information and belief, Defendant Warren is a citizen of Texas.

**Defendant Long**

31.     Defendant Thomas E. Long ("Long") has served as the General Partner's CFO since February 2016, and has served as a director of the General Partner since April 2019. According to the 2019 10-K, as of February 14, 2020, Defendant Long beneficially owned 221,560 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Long owned approximately $2.81 million worth of Energy Transfer units.

32.     For the fiscal year ended December 31, 2018, Defendant Long received $6,609,967 in compensation from the General Partner. This included $537,338 in salary, a $1,000,000 bonus, $4,251,335 in equity awards, $800,000 in non-equity incentive plan compensation, and $21,294 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Long received $4,845,208 in compensation from the General Partner. This included $570,869 in salary, $3,352,795 in equity awards, $900,000 in non-equity incentive plan compensation, and $21,544 in all other compensation.

33.     The Company's 2019 10-K stated the following about Defendant Long:

***Thomas E. Long.*** Mr. Long has served as the Chief Financial Officer of our general partner since February 2016 and a director of our general partner since April 2019. Mr. Long also served as the Chief Financial Officer and as a director of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Mr. Long also serves as Chief Financial Officer of ETO and was previously Executive Vice President and Chief Financial Officer of Regency GP LLC from November 2010 to April 2015. From May 2008 to November 2010, Mr. Long served as Vice President and Chief Financial Officer of Matrix Service Company. Prior to joining Matrix, he served as Vice President and Chief Financial Officer of DCP Midstream Partners, LP, a publicly traded natural gas and natural gas liquids midstream business company located in Denver, Colorado. In that position, he was responsible for all financial aspects of the company since its formation in December 2005. From 1998 to 2005, Mr. Long served in several executive positions with subsidiaries of Duke Energy Corp., one of the nation's largest electric power companies. Mr. Long has served as a director of Sunoco LP since May 2016, and as Chairman of the Board of USAC

since April 2018. Mr. Long was selected to serve on our Board of Directors because of his understanding of energy-related corporate finance gained through his extensive experience in the energy industry.

34.     Upon information and belief, Defendant Long is a citizen of Texas.

**Defendant McReynolds**

35.     Defendant John W. McReynolds ("McReynolds") served as the President of the General Partner from March 2005 until October 2018, on which date he became Special Advisor to the General Partner. He has also served as a director of the General Partner since August 2005. According to the 2019 10-K, as of February 14, 2020, Defendant McReynolds beneficially owned 27,270,400 of the Company's common units, which represented 1.1% of the Company's outstanding units as of that date. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant McReynolds owned approximately $384.4 million worth of Energy Transfer units.

36.     For the fiscal year ended December 31, 2018, Defendant McReynolds received $1,422,273 in compensation from the General Partner. This included $606,306 in salary, $800,000 in non-equity incentive plan compensation, and $15,967 in all other compensation.

37.     The Company's 2019 10-K stated the following about Defendant McReynolds:

*John W. McReynolds.* Mr. McReynolds became Special Advisor to ET in October 2018. Prior to that time, Mr. McReynolds served as our President from March 2005 until October 2018. He has served as a Director since August 2005. He served as our Chief Financial Officer from August 2005 to June 2013, and previously served as a Director of ETO's general partner from August 2001 through May 2010. Mr. McReynolds has been in the energy industry for his entire career. Prior to joining Energy Transfer, Mr. McReynolds was in private law practice for over 20 years, specializing exclusively in energy-related finance, securities, corporations and partnerships, mergers and acquisitions, syndications, and a wide variety of energy-related litigation. His practice dealt with all forms of fossil fuels, and the transportation and handling thereof, together with the financing and structuring of all forms of business entities related thereto. The members of our general partner selected Mr. McReynolds to serve in the indicated roles with the Energy Transfer partnerships because of this extensive

background and experience, as well as his many contacts and relationships in the industry.

38.     Upon information and belief, Defendant McReynolds is a citizen of Texas.

**Defendant McCrea**

39.     Defendant Marshall S. McCrea, III ("McCrea") has served as the President and Chief Commercial Officer ("CCO") of the General Partner since October 2018, and has served as a director of the General Partner since December 2009. According to the 2019 10-K, as of February 14, 2020, Defendant McCrea beneficially owned 2,087,848 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant McCrea owned approximately $26.5 million worth of Energy Transfer units.

40.     For the fiscal year ended December 31, 2018, Defendant McCrea received $10,780,120 in compensation from the General Partner. This included $1,059,976 in salary, $7,834,782 in equity awards, $1,866,000 in non-equity incentive plan compensation, and $19,362 in all other compensation. For the fiscal year ended December 31, 2019, Defendant McCrea received $11,601,341 in compensation from the General Partner. This included $1,094,260 in salary, $8,734,720 in equity awards, $1,750,817 in non-equity incentive plan compensation, and $21,544 in all other compensation.

41.     The Company's 2019 10-K stated the following about Defendant McCrea:

***Marshall S. (Mackie) McCrea, III.*** Mr. McCrea is the President and Chief Commercial Officer of our general partner, having served in that role since October 2018 following the merger of Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P. Prior to that time, he had been the Group Chief Operating Officer and Chief Commercial Officer of the Energy Transfer family since November 2015. Mr. McCrea has served on the Board of Directors of our general partner since December 2009. Mr. McCrea was appointed as a director of the general partner of ETO in December 2009. Prior to that, he served as President and Chief Operating Officer of ETO's general partner from June 2008

11

to November 2015 and President – Midstream from March 2007 to June 2008. Previously he served as the Senior Vice President – Commercial Development since January 2004. In March 2005, Mr. McCrea was named President of La Grange Acquisition LP, ETO's primary operating subsidiary, after serving as Senior Vice President-Business Development and Producer Services since 1997. Mr. McCrea also served as the Chairman of the Board of Directors of the general partner of Sunoco Logistics from October 2012 to April 2017. The members of our general partner selected Mr. McCrea to serve as a director because he brings extensive project development and operational experience to the Board. He has held various positions in the natural gas business over the past 25 years and is able to assist the Board of Directors in creating and executing the Partnership's strategic plan.

42.      Upon information and belief, Defendant McCrea is a citizen of Texas.

**Defendant Ramsey**

43.      Defendant Matthew S. Ramsey ("Ramsey") has served as the Chief Operating Officer ("COO") of the General Partner since October 2018, and has served as a director of the General Partner since July 2012. According to the 2019 10-K, as of February 14, 2020, Defendant Ramsey beneficially owned 258,213 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Ramsey owned approximately $3.28 million worth of Energy Transfer units.

44.      For the fiscal year ended December 31, 2018, Defendant Ramsey received $4,400,195 in compensation from the General Partner. This included $662,486 in salary, $2,818,415 in equity awards, $900,000 in non-equity incentive plan compensation, and $19,294 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Ramsey received $4,715,743 in compensation from the General Partner. This included $683,913 in salary, $3,123,186 in equity awards, $889,100 in non-equity incentive plan compensation, and $19,544 in all other compensation.

45.      The Company's 2019 10-K stated the following about Defendant Ramsey:

***Matthew S. Ramsey.*** Mr. Ramsey was appointed as a director of ET's general partner in July 2012 and as a director of ETO's general partner in November 2015. Mr. Ramsey has been the Chief Operating Officer or our general partner since October 2018 following the merger of Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P., and currently serves as President and Chief Operating Officer of ETO's general partner since November 2015. Mr. Ramsey also served as President and Chief Operating Officer and Chairman of the board of directors of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Mr. Ramsey is also a director of Sunoco LP, having served as chairman of Sunoco LP's board since April 2015, and of USAC, having served on that board since April 2018. Mr. Ramsey previously served as President of RPM Exploration, Ltd., a private oil and gas exploration partnership, and previously served as a director of RSP Permian, Inc. where he served on the audit and compensation committees. Mr. Ramsey formerly served as President of DDD Energy, Inc. until its sale in 2002. From 1996 to 2000, Mr. Ramsey served as President and Chief Executive Officer of OEC Compression Corporation, Inc., a publicly traded oil field service company, providing gas compression services to a variety of energy clients. Previously, Mr. Ramsey served as Vice President of Nuevo Energy Company, an independent energy company. Additionally, he was employed by Torch Energy Advisors, Inc., a company providing management and operations services to energy companies including Nuevo Energy, last serving as Executive Vice President. Mr. Ramsey joined Torch Energy as Vice President of Land and was named Senior Vice President of Land in 1992. Mr. Ramsey holds a B.B.A. in Marketing from the University of Texas at Austin and a J.D. from South Texas College of Law. Mr. Ramsey is a graduate of Harvard Business School Advanced Management Program. Mr. Ramsey is licensed to practice law in the State of Texas. He is qualified to practice in the Western District of Texas and the United States Court of Appeals for the Fifth Circuit. Mr. Ramsey formerly served as a director of Southern Union Company. The members of our general partner recognize Mr. Ramsey's vast experience in the oil and gas space and believe that he provides valuable industry insight as a member of our Board of Directors.

46.     Upon information and belief, Defendant Ramsey is a citizen of Texas.

**Defendant Anderson**

47.     Defendant Steven R. Anderson ("Anderson") has served as a director of the General Partner since June 2018. He also serves as a member of the General Partner's Audit Committee and Compensation Committee. According to the 2019 10-K, as of February 14, 2020, Defendant Anderson beneficially owned 1,544,598 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on

February 14, 2020 was $12.72, Defendant Anderson owned approximately $19.6 million worth of Energy Transfer units.

48.     For the fiscal year ended December 31, 2018, Defendant Anderson received $135,960 in compensation from the General Partner. This included $91,760 in fees paid in cash and $44,200 in unit awards. For the fiscal year ended December 31, 2019, Defendant Anderson received $222,498 in compensation from the General Partner. This included $122,500 in fees paid in cash and $99,998 in unit awards.

49.     The Company's 2019 10-K stated the following about Defendant Anderson:

***Steven R. Anderson.*** Mr. Anderson was elected to the Board of Directors of our general partner in June 2018 and serves on the audit committee and compensation committee. Mr. Anderson began his career in the energy business in the early 1970's with Conoco in the Permian Basin area. He then spent some 25 years with ANR Pipeline and its successor, The Coastal Corporation, as a natural gas supply and midstream executive. He later was Vice President of Commercial Operations with Aquila Midstream and, upon the sale of that business to Energy Transfer in 2002, he became a part of the management team there. For the six years prior to his retirement from Energy Transfer in October 2009, he served as Vice President of Mergers and Acquisitions. Since that time, he has been involved in private investments and has served on the boards of directors of the St. John Health System and Saint Simeon's Episcopal Home in Tulsa, Oklahoma, as well as various other community and civic organizations. Mr. Anderson also served as a member of the board of directors of Sunoco Logistics Partners L.P. from October 2012 until April 2017. The members of our general partner selected Mr. Anderson to serve on our Board of Directors based on his experience in the midstream energy industry generally, and his knowledge of Energy Transfer's business specifically. Mr. Anderson also brings recent experience on audit and compensation committees of another publicly traded partnership.

50.     Upon information and belief, Defendant Anderson is a citizen of Texas.

**Defendant Brannon**

51.     Defendant Richard D. Brannon ("Brannon") has served as a director of the General Partner since March 2016. He also serves as the Chairman of the General Partner's Audit Committee. According to the 2019 10-K, as of February 14, 2020, Defendant Brannon

beneficially owned 292,102 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Brannon owned approximately $3.71 million worth of Energy Transfer units.

52.     For the fiscal year ended December 31, 2018, Defendant Brannon received $294,225 in compensation from the General Partner. This included $194,225 in fees paid in cash and $100,000 in unit awards. For the fiscal year ended December 31, 2019, Defendant Brannon received $224,498 in compensation from the General Partner. This included $125,000 in fees paid in cash and $99,998 in unit awards.

53.     The Company's 2019 10-K stated the following about Defendant Brannon:

***Richard D. Brannon.*** Mr. Brannon was appointed to the Board of Directors of our general partner in March 2016 and has served as the Chairman of the audit committee snice April 2016. Mr. Brannon is the CEO of CH4 Energy II, CH4 Energy Six, and CH4 Energy-Finley Utah, LLC, all independent companies focused on horizontal oil and gas development. Mr. Brannon previously served on the board of directors of WildHorse Resource Development from its IPO in December 2016 until June 2018. Mr. Brannon also formerly served on the Board of Directors and as a member of the audit committee and compensation committee of Sunoco LP, Regency, OEC Compression and Cornerstone Natural Gas Corp. He has over 35 years of experience in the energy business, having started his career in 1981 with Texas Oil & Gas. The members of our general partner selected Mr. Brannon to serve as director based on his knowledge of the energy industry and his experience as a director and audit and compensation committee member for other public companies.

54.     Upon information and belief, Defendant Brannon is a citizen of Texas.

**Defendant Davis**

55.     Defendant Ray C. Davis ("Davis") is a co-founder of the Company, and has served as a director of the General Partner since July 2018. He also served as a director of ETO from February 2013 until February 2018. According to the 2019 10-K, as of February 14, 2020, Defendant Davis beneficially owned 87,891,686 of the Company's common units, which represented 3.3% of the Company's outstanding units as of that date. Given that the price per

15

unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Davis owned approximately $1.11 billion worth of Energy Transfer units.

56.     For the fiscal year ended December 31, 2018, Defendant Davis received $67,700 in compensation from the General Partner for his role as a Company director. This included $25,000 in fees paid in cash and $42,700 in unit awards. He also received $49,750 in compensation from the General Partner for his role as a director of ETO, which consisted entirely of fees paid in cash. For the fiscal year ended December 31, 2019, Defendant Davis received $199,998 in compensation from the General Partner. This included $100,000 in fees paid in cash and $99,998 in unit awards.

57.     The Company's 2019 10-K stated the following about Defendant Davis:

*Ray C. Davis.* Mr. Davis was appointed to the Board of Directors of the general partner of Energy Transfer LP in July 2018 and served on the Board of Directors of Energy Transfer Partners, L.L.C. from February 2018 until July 2018. From February 2013 until February 2018, Mr. Davis was an independent investor. He has also been a principal owner, and served as co-chairman of the board of directors, of the Texas Rangers major league baseball club since August 2010. Mr. Davis previously served on the Board of Directors of Energy Transfer LP (formerly Energy Transfer Equity, L.P.), effective upon the closing of its IPO in February 2006 until his resignation in February 2013. Mr. Davis also served as ETO's Co-Chief Executive Officer from the combination of the midstream and transportation operations and the retail propane operations in January 2004 until his retirement from these positions in August 2007, and as the Co-Chairman of the Board of Directors of our general partner from January 2004 until June 2011. Mr. Davis also held various executive positions with Energy Transfer prior to 2004. From 1996 to 2000, he served as a Director of Crosstex Energy, Inc. From 1993 to 1996, he served as Chairman of the Board of Directors and Chief Executive Officer of Cornerstone Natural Gas, Inc. Our general partner selected Mr. Davis to serve as director based on his over 40 years of business experience in the energy industry and his expertise in the Partnership's asset portfolio.

58.     Upon information and belief, Defendant Davis is a citizen of Texas.

**Defendant Grimm**

59.     Defendant Michael K. Grimm ("Grimm") has served as a director of the General Partner since October 2018, and serves as a member of the General Partner's Audit Committee and Compensation Committee. He has also served as a director of ETO since December 2005. According to the 2019 10-K, as of February 14, 2020, Defendant Grimm beneficially owned 110,639 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Grimm owned approximately $1.4 million worth of Energy Transfer units.

60.     For the fiscal year ended December 31, 2018, Defendant Grimm received $305,493 in compensation from the General Partner for his role as a director of ETO. This included $205,425 in fees paid in cash and $100,068 in unit awards. For the fiscal year ended December 31, 2019, Defendant Grimm received $229,998 in compensation from the General Partner. This included $130,000 in fees paid in cash and $99,998 in unit awards.

61.     The Company's 2019 10-K stated the following about Defendant Grimm:

*Michael K. Grimm.* Mr. Grimm was appointed to the Board of Directors of our general partner in October 2018, and has served on the audit committee and compensation committee since that time. Prior to that time, Mr. Grimm served as a director of ETO's general partner beginning in December 2005, and served on the audit and compensation committee during that time. Mr. Grimm is one of the original founders of Rising Star Energy, L.L.C., a privately held upstream exploration and production company active in onshore continental United States, and served as its President and Chief Executive Officer from 1995 until 2006 when it was sold. Mr. Grimm is currently President of Rising Star Petroleum, LLC. Mr. Grimm was formerly Chairman of the Board of RSP Permian, Inc. (NYSE: RSPP) from January 2014 until June 2018 and since November 2018 has served on the Board of Directors of Anadarko Petroleum Corporation (NYSE: APC). Prior to the formation of Rising Star, Mr. Grimm was Vice President of Worldwide Exploration and Land for Placid Oil Company from 1990 to 1994. Prior to joining Placid Oil Company, Mr. Grimm was employed by Amoco Production Company for thirteen years where he held numerous positions throughout the exploration department in Houston, New Orleans and Chicago. Mr. Grimm has been an active member of the Independent Petroleum

Association of America, the American Association of Professional Landmen, Dallas Producers Club, Houston Producers Forum, Fort Worth Wildcatters and the All-American Wildcatters. He has a B.B.A. from the University of Texas at Austin. The members of our general partner selected Mr. Grimm to serve as a director because of his extensive experience in the energy industry and his service as a senior executive at several energy-related companies, in addition to his contacts in the industry gained through his involvement in energy-related organizations.

62.     Upon information and belief, Defendant Grimm is a citizen of Texas.

**Defendant Turner**

63.     Defendant K. Rick Turner ("Turner") served as a director of the General Partner from October 2002 until he resigned on June 1, 2018.

64.     For the fiscal year ended December 31, 2018, Defendant Turner received $199,701 in compensation from the General Partner for his role as a Company director. This included $99,701 in fees paid in cash and $100,000 in unit awards. He also received $146,620 in compensation from the General Partner for his role as a director of Sunoco, which consisted of $46,614 in fees paid in cash and $100,006 in unit awards.

65.     The Company's annual report on Form 10-K filed with the SEC on February 23, 2018 (the "2017 10-K") stated the following about Defendant Turner:

> **K. Rick Turner.**  Mr. Turner has served as a director of our general partner since October 2002. Mr. Turner currently serves as chair of the Compensation Committee and a member of the Audit Committee. Mr. Turner is also a director of Sunoco LP, serving as chair of Sunoco LP's compensation and audit committees. Mr. Turner is presently a managing director of Altos Energy Partners, LLC. Mr. Turner previously was a private equity executive with several groups after retiring from the Stephens' family entities, which he had worked for since 1983. He first became a private equity principal in 1990 after serving as the Assistant to the Chairman, Jackson T. Stephens. His areas of focus have been oil and gas exploration, natural gas gathering, processing industries, and power technology. Prior to joining Stephens, he was employed by Peat, Marwick, Mitchell and Company. Mr. Turner currently serves as a director of AmeriGas Partners, L.P. Mr. Turner earned his B.S.B.A. from the University of Arkansas and is a non-practicing Certified Public Accountant. The members of our general partner selected Mr. Turner based on his industry knowledge, his background in

corporate finance and accounting, and his experience as a director and audit committee member on the boards of several other companies.

66.     Upon information and belief, Defendant Turner is a citizen of Texas.

**Defendant Washburne**

67.     Defendant Ray W. Washburne ("Washburne") has served as a director of the General Partner since April 2019. He also serves as a member of the General Partner's Compensation Committee. According to the 2019 10-K, as of February 14, 2020, Defendant Washburne beneficially owned 2,110 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Washburne owned approximately $26,839 worth of Energy Transfer units.

68.     For the fiscal year ended December 31, 2019, Defendant Washburne received $81,881 in compensation from the General Partner. This included $48,756 in fees paid in cash and $33,125 in unit awards.

69.     The Company's 2019 10-K stated the following about Defendant Washburne:

***Ray W. Washburne.*** Mr. Washburne was appointed to the Board of Directors of our general partner in April 2019. He is currently President and Chief Executive Officer of Charter Holdings, Inc., a Dallas-based investment company involved in real estate, restaurants and diversified financial investments. In addition, he currently serves on the President's Intelligence Advisory Board (PIAB). From August 2017 to February 2019, Mr. Washburne served as the President and Chief Executive Officer of the Overseas Private Investment Corporation (OPIC), the United States government's development finance institution. From 2000 to 2017, Mr. Washburne served on the board of directors of Veritex Holdings, Inc. (Nasdaq: VBTX), a Texas -based bank holding company that conducts banking activities through its subsidiary, Veritex Community Bank. He has also served as an adjunct professor at the Cox School of Business at Southern Methodist University. Mr. Washburne is also a member of the Republican Governors Association Executive Roundtable, the American Enterprise Institute, the Council on Foreign Relations, and is on the Advisory Board of the United States Southern Command. The members of our general partners selected Mr. Washburne to serve on the Board of Directors because of his expertise in international finance, his relationships in government, and his experience on the board of a publicly traded company.

70.     Upon information and belief, Defendant Washburne is a citizen of Texas.

**Defendant Williams**

71.     Defendant William P. Williams ("Williams") served as a director of the General Partner from March 2012 until he resigned on October 19, 2018.

72.     For the fiscal year ended December 31, 2018, Defendant Williams received $228,650 in compensation from the General Partner. This included $128,650 in fees paid in cash and $100,000 in unit awards.

73.     The Company's 2017 10-K stated the following about Defendant Williams:

*William P. Williams.* Mr. Williams was appointed as a director in March 2012 and currently serves as a member of the Audit Committee. Mr. Williams began his career in the oil and gas industry in 1967 with Texas Power and Light Company as Manager of Pipeline Construction for Bi-Stone Fuel Company, a predecessor of Texas Utilities Fuel Company. In 1980, he was employed by Endevco as Vice President of Pipeline and Plant Construction, Engineering, and Operations. Prior to Endevco, he worked for Cornerstone Natural Gas. Mr. Williams later joined Energy Transfer Partners, L.P. as Vice President of Engineering and Operations, ending his career as Vice President of Measurement in May 2011. The members of our general partner selected Mr. Williams due to his experience in the pipeline industry and his familiarity with our business.

74.     Upon information and belief, Defendant Williams is a citizen of Texas.

**FIDUCIARY DUTIES OF THE DEFENDANTS**

75.     By reason of Defendant LE GP's role as the general partner of Energy Transfer, and by reason of the Individual Defendants' positions as officers, directors, and/or fiduciaries of the General Partner and the Company, and because of their ability to control the business and corporate affairs of Energy Transfer, Defendant LE GP and the Individual Defendants owed Energy Transfer and its unitholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Energy Transfer in a fair, just, honest, and equitable manner.

20

76.     The General Partner, and each director and officer of the General Partner owes to Energy Transfer and its unitholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets.

77.     The General Partner, as well as the Individual Defendants, because of their positions of control and authority as directors and/or officers of the General Partner, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

78.     To discharge their duties, the General Partner and the officers and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

79.     Defendant LE GP, by virtue of its role as general partner of the Company, and each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its unitholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the General Partner, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its unitholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

80.     As general partner, and senior executive officers and directors of the general partner of a publicly-traded company whose common units were registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the

Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

81.     To discharge their duties, the General Partner and the officers and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of the General Partner were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Energy Transfer's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Energy Transfer conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Energy Transfer and procedures for the reporting of the business

and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

        (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Energy Transfer's operations would comply with all applicable laws and Transfer's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's unitholders would be accurate;

        (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

        (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

        (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

82.     At all times relevant hereto, the Individual Defendants were the agents of each other, of the General Partner, and of Energy Transfer and were at all times acting within the course and scope of such agency.

83.     Because of their advisory, executive, managerial, and directorial positions with the General Partner, each of the Individual Defendants had access to adverse, non-public information about the Company.

84.     The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Energy Transfer.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Defendants caused the Company to conceal the true facts as alleged herein. The Defendants further aided and abetted and assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the General Partner and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

87.     The   Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Defendants collectively and individually took the actions set forth herein.

88.     The General Partner and each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the

Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, of the General Partner, and of Energy Transfer, and was at all times acting within the course and scope of such agency.

## ENERGY TRANSFER'S CODE OF CONDUCT

90.     Regarding the Company's policy objectives, the Company's Code of Conduct states the following:

> LE GP, LLC (the "Company"), the general partner of Energy Transfer LP (the "Partnership"), has adopted a number of policies dealing with business conduct and ethics of the Company and the Partnership (collectively, the "Partnership Group"). We believe that strict adherence to these policies is not only right, but is in the best interest of the Company, its unitholders, its customers, and the industry in general. ***In all instances, the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical manner*. *Every Employee acting on behalf of the Partnership Group must adhere to these policies***.

(Emphasis added.)

91.     The Code of Conduct defines the term "Employee" as including "all employees of the Partnership Group who provide services to or for the benefit of the Partnership Group, and the officers and members of the Board of Directors of the Company."

92.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct provides the following:

> ***The ethical standards of the Partnership Group rest on obeying the law. Employees must respect and obey the laws of the cities, states and countries in which the Partnership Group operates***. This Code of Business Conduct and Ethics obviously cannot mention every law that might be applicable. Although not all individuals are expected to know the details of these laws, it is important

for Employees to be familiar with the laws that apply to their respective areas of responsibility, and to know enough to determine when to seek advice from supervisors, managers, the Company's President or other appropriate personnel. Because the Company is the general partner of a publicly traded partnership, Employees should be aware of the laws regarding the trading of securities of the Partnership while in possession of material, non-public information relating to the Partnership.

(Emphasis added.)

93.     In a section titled, "Conflicts of Interest," the Code of Conduct provides, in

relevant part, the following:

A "conflict of interest" occurs when an individual's private interest interferes in any way, or even appears to interfere, with the interests of the Partnership Group as a whole. A conflict situation can arise when an Employee takes actions or has interests that may make it difficult to perform his/her work for the Partnership Group objectively and effectively. Conflicts of interest also arise when an Employee, or a member of his/her family, receives improper personal benefits as a result of his/her position in the Partnership Group. Loans to, or guarantees of obligations of, such persons are of special concern.

* * *

You must avoid conflicts of interest unless specific, written pre-approval has been obtained from the Company's President. In the absence of pre-approval, you must abandon or forfeit the activity or interest that creates the conflict, or seek a waiver pursuant to the provisions of this Code of Business Conduct and Ethics. Any pre-approval for an executive officer must be obtained from the Board of Directors.

94.     In a section titled, "Sensitive Payments," the Code of Conduct provides that

Company funds may not be used to secure special treatment for the Company or the General

Partner, stating the following:

*It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the Partnership Group.* It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any

knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

(Emphasis added.)

95.     The Code of Conduct defines the term "Sensitive Payments" as including:

a)      receipts from or payments to governmental officials or employees;

b)      commercial bribes or kickbacks;

c)      amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;

d)      corporate political contributions; and

e)      payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.

96.     In a section titled, "Payments and Gifts to Government Officials (U.S. or Foreign)," the Code of Conduct emphasizes that gifts or other items of value must not be provided to government officials in connection with Company business without written approval, stating the following:

Compliance with the Partnership's Anti-Corruption Policy and the U.S. Foreign Corrupt Practices Act and other anti-corruption laws is required. What is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign). There are strict laws that govern providing gifts, including meals, entertainment, transportation and lodging, to certain government (U.S. or foreign) officials, employees and consultants. Because of the sensitive nature of these relationships, you should not provide gifts or anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department.

97.     In a section titled, "Protection and Proper Use of Assets and Proprietary Information," the Code of Conduct provides, in relevant part, the following:

> All Employees should protect the assets of the Partnership Group and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Partnership Group's profitability. All assets of the Partnership Group should be used only for legitimate business purposes. The use of Company equipment, property or proprietary information in violation of this Code, or for any use other than its intended business use, is prohibited unless otherwise authorized.

98.     In a section titled, "Ethical Behavior," the Code of Conduct provides, in relevant part, the following:

> ***Every Employee is expected to act with honesty and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment. Each Employee is required to adhere to the highest ethical standards in fulfilling our responsibilities to, and on behalf of the Partnership Group and its investors. Each Employee is required to deal fairly and honestly with other employees, customers, vendors and third parties.*** Each Employee should actively encourage ethical conduct among his or her fellow officers, directors and employees. When collecting information or other data on competitors of the Partnership Group, Employees must use only legitimate resources and not take any actions that are illegal, unethical or could cause embarrassment to the Partnership Group.

(Emphasis added.)

99.     In a section titled, "Financial Record Keeping," the Code of Conduct provides the following:

> It is our policy that all books and records of the Partnership Group fully and fairly reflect the assets, liabilities, receipts and expenditures of the Partnership Group. ***Attempts to create false or misleading records are forbidden. No undisclosed funds or accounts shall be established for any purpose.*** Knowledge of secret cash funds or slush funds should be reported to the Company's President or to the Audit Committee of the Board.

(Emphasis added.)

100.    In a section titled, "Report Preparation," the Code of Conduct provides the following:

Accounting and reporting standards and procedures established by the Partnership Group must be followed to ensure that assets are protected and properly used and that financial records and reports are accurate and reliable. ***Financial statements published by the Partnership Group must fairly present its operating results and financial position***. Improper or fraudulent accounting, documentation or financial reporting are in violation of our policy and may also be in violation of applicable laws. ***All internal records supporting the financial statements of the Partnership Group must be prepared accurately, completely and properly***.

(Emphasis added.)

101.    In a section titled, "Full, Fair, Accurate and Timely Disclosure for SEC Filings," the Code of Conduct provides the following:

The Partnership Group has established policies and procedures that help to ensure that each SEC report and public communication (including press releases) contains information that is full, fair, accurate, timely and understandable. ***Every Employee must follow these policies and procedures to ensure that this information is timely, accurate, consistent and credible***.

(Emphasis added.)

102.    In a section titled, "Concealment of Information from Auditors," the Code of Conduct provides the following:

It is our policy for Employees to provide the Company's Chief Financial Officer and his/her accounting staff and outside auditors with any and all information they request. Since the audit function is a vital tool of management in the conduct of the affairs of the Partnership Group, the concealment of information, whether financial or operational, or allowing misleading information to be provided to the internal accounting staff or outside auditors could result in inaccurate evaluations and improper decisions concerning the activities of the Partnership Group.

103.    In a section titled, "Reporting Suspected Violations of this Code," the Code of Conduct states that all officers and directors must report violations or suspected violations of the Code of Conduct, including violations pertaining to the securities laws, breaches of fiduciary duty, and the Company's internal controls. The Code of Conduct provides as follows:

Every Employee shall first report violations or potential violations of this Code to his or her supervisor(s), or the appropriate officer of the Partnership Group, of the Employee's complaint or concerns. ***Every officer and director of the Partnership Group, regardless of whether such person is also an Employee, shall report violations or potential violations of this Code to another officer or director of the Partnership Group to whom such person is required to report, one of the Chief Financial Officer, the President, or the Audit Committee, and if appropriate, to the Board of Directors***. Because Employees may be reluctant or unable to report such violations or potential violations dealing with a material violation of the securities laws, breach of fiduciary duty or that relate to accounting, internal accounting controls and auditing matters, the Audit Committee has also established procedures providing for the confidential and anonymous reporting of violations to the Audit Committee or such other committee or department established by the Audit Committee for receiving and reviewing reports of violations. Retaliation against any employee who in good faith reports a suspected violation will not be tolerated. ***All reports of suspected violations will be evaluated by the Audit Committee or persons designated by it to investigate such reports***. An investigation of the reported violation will be conducted if the evaluation indicates that there is a likelihood that a problem exists. All Employees are obliged to cooperate with such investigations and to be truthful and forthcoming in the course of such investigations. ***Persons violating the standards in this Code, including failure to report fraud, will be subject to appropriate disciplinary action***, which may include written notice of a violation, censure by the Board, demotion, suspension, loss of pay, termination, referral for criminal prosecution, and restitution to the Partnership or others for any losses or damages resulting from the violation

(Emphasis added.)

104.    The General Partner and the Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to allow the Company to utilize permits that were obtained through the use of coercion, bribery, or other improper methods, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and failing to report the same. Moreover, in violation of the Code of Conduct, the Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ENERGY TRANSFER'S SUPPLEMENTAL CODE OF ETHICS

105.    The Company also maintains a Code of Ethics for Senior Financial Officers (the "Code of Ethics"), which provides that it applies to the General Partner's CEO and CFO, and states that the obligations of the Code of Ethics "supplement, but do not replace, the Code of Business Conduct and Ethics applicable to all employees of the Company and its subsidiaries, as well as the Company's officers and directors."

106.    The Code of Ethics provides that the General Partner's CEO and CFO must:

*Act with honesty and integrity, avoiding actual or apparent conflicts of interest with the Company and the Partnership in professional relationships that would likely be viewed as materially impairing the Senior Financial Officer's exercise of judgment on behalf of the Company or the Partnership*. Avoid actual or apparent conflicts of interest in all cases unless a specific, case‐by‐case exception has been made after review and approval of specific circumstances by the Board of Directors. Prohibited conflicts of interests for Senior Financial Officers include significant work for an outside employer, or transactions between the Company or the Partnership and any other enterprise in which the Senior Financial Officer has an interest (other than owning a de minimis amount of publicly traded securities), including those in which a family member of a Senior Financial Officer has an interest.

*Take reasonable steps to cause the Partnership to provide fair, accurate, timely, and understandable disclosure in reports and documents that the Partnership files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications*, including taking reasonable steps to cause the employees providing services to the Partnership to follow its internal accounting controls at all times.

*Not violate applicable laws, rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies*. Although no single individual is expected to know the details of all laws, rules and regulations, it is important to take reasonable steps to ensure familiarity with all such laws, rules and regulations and to know enough to determine when to seek advice or guidance through the retention of qualified legal, financial and accounting experts, or other means.

* * *

*Establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic report during the period in which the periodic report is being prepared*.

31

* * *

> ***Bring to the attention of the Chairman of the Audit Committee of the Board of Directors matters that could compromise the integrity of the Partnership's public filings and communications***, disagreements on accounting matters and violations of any part of this Code.

(Emphasis added.)

107.    Defendants Warren and Long violated the Code of Ethics by engaging in or permitting the scheme to allow the Company to utilize permits that were obtained through the use of coercion, bribery, or other improper methods, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and failing to report the same. Moreover, in violation of the Code of Ethics, Defendants Warren and Long failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## ENERGY TRANSFER'S CORPORATE GOVERNANCE GUIDELINES

108.    Furthermore, the Company maintains Corporate Governance Guidelines adopted by the Board, which define the Board's responsibilities to the Company, described therein as the "Partnership." Specifically, the governance guidelines outline the following, in relevant part:

> [t]he function of the Board is to provide guidance to and controls on the activities of the Partnership, in the exercise of the business judgment of each individual director. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the senior management of the General Partner and the Partnership and their outside advisors and auditors.

109.    In a section titled "Chief Executive Officer Evaluation: Management Succession" the Corporate Governance Guidelines state the following:

> A. *CEO Evaluation.* The Compensation Committee will conduct an annual review of the Chief Executive Officer's performance, as provided in its charter.

*The Board of Directors will review the Compensation Committee's report with a view to ensuring that the Chief Executive Officer is providing appropriate leadership for the Partnership Group in the long- and short-term.*

(Emphasis added.)

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

110.   Energy Transfer is an energy transportation and storage company based in Dallas, Texas, and conducting business primarily in the U.S. The Company was founded in 2002, and prior to October 2018, operated under the name Energy Transfer Equity, L.P. The Company is organized as a Delaware limited partnership and operates as a subsidiary of the Company's general partner, Defendant LE GP. Defendant LE GP manages and directs all of Energy Transfer's activities, and the officers and directors of Defendant LE GP function as the officers and directors of Energy Transfer.

111.   Regarding Defendant LE GP's control over the Company's activities, the 2019 10-K states the following:

> Our general partner, LE GP, LLC, manages and directs all of our activities. The officers and directors of ET are officers and directors of LE GP, LLC. The members of our general partner elect our general partner's Board of Directors. The board of directors of our general partner has the authority to appoint our executive officers, subject to provisions in the limited liability company agreement of our general partner. Pursuant to other authority, the board of directors of our general partner may appoint additional management personnel to assist in the management of our operations and, in the event of the death, resignation or removal of our chief executive officer, to appoint a replacement.

112.   Energy Transfer possesses several subsidiaries, such as ETO and Sunoco, among others, through which the Company conducts its operations. The Company's operations include natural gas transportation and storage, NGL transportation, storage, and fractionation services, crude and refined oil transportation, and terminalling, acquisition, and marketing activities.

113.    In connection with its operations, the Company owns three natural gas storage facilities located in Texas, as well as around 9,400 miles of intrastate natural gas transportation pipelines, and around 12,200 miles of interstate natural gas transportation pipelines. Energy Transfer's natural gas transportation systems are among the largest in the U.S.

114.    One of the Company's most significant pipeline systems is the Mariner East Pipeline, an almost $3 billion NGL pipeline project extending across Pennsylvania. The Mariner East Pipeline was designed to transport NGLs from the Marcellus and Utica Shales in West Virginia, Ohio, and parts of Western Pennsylvania, to industrial complexes throughout Pennsylvania, including the Company's Marcus Hook complex on the Delaware River (the "Marcus Hook Industrial Complex"). The first phase of the Mariner East Pipeline, Mariner East 1, commenced intrastate and interstate operations in 2014 and 2016, respectively.

115.    On February 13, 2017, PDEP approved earth-moving and water-crossing construction permits in connection with Mariner East 2, the second phase of the Mariner East Pipeline, which would extend the pipeline to the Marcus Hook Industrial Complex.

116.    The Company had submitted permit applications in connection with the Mariner East Pipeline as early as May 2014. According to a number of news sources reporting on the proposed second phase project, the Company had previously experienced significant challenges to obtaining approval of these permit applications due to numerous deficiencies in the applications, as well as public concern over the environmental impact of the projects. As such, the speed at which the Mariner East 2 permit was approved was surprising.

117.    For instance, a State Impact Pennsylvania NPR ("NPR") article published on September 15, 2016, titled "DEP gives Sunoco long to-do list on Mariner East 2 pipeline plan" noted that PDEP had identified "hundreds of issues" remaining in the Company's construction

Case 3:20-cv-00719-X   Document 1   Filed 03/25/20   Page 35 of 68   PageID 35

plans over a year after Sunoco, which was handling construction of the pipeline, had submitted permit applications.[3]

118.    An NPR article published on February 13, 2017, titled, "DEP approves Mariner East 2 permits," commented on the permit application process and the surprising speed at which the permits had been approved as follows:[4]

> The Pennsylvania Department of Environmental Protection has approved earth-moving and water-crossing permits for Sunoco's controversial Mariner East 2 pipeline project, paving the way for construction on the 350-mile line that would begin in Ohio and West Virginia, and travel through 17 counties across Pennsylvania to Sunoco's Marcus Hook plant in Delaware County. The pipeline would carry natural gas liquids from Marcellus and Utica Shale fields to Sunoco's export terminal, where the plan is to ship the gas to Scotland to make plastics.

> The company began its permit applications in May 2014, and was sent back to the drawing table several times by [P]DEP for glaring deficiencies. Acting [P]DEP Secretary Patrick McDonnell said in a release that permits were issued "after extensive review."

> * * *

> Critics of the pipeline project are skeptical that the hundreds of deficiencies detailed previously by the agency could have been corrected in such a short period of time. Gerhart says the application doesn't even include mention of her drinking water well.

> * * *

> "[P]DEP issued the permits for the ME II pipeline, despite continuing complaints from the public, citizens' groups and environmental organizations, about risks to public health and safety, inaccurate delineation of wetlands, incomplete and deficient permit applications and the agency's denial of repeated requests for a new public comment period," said Pam Bishop.

119.    A subsequent NPR article published on March 10, 2017, titled, "DEP approves Mariner East 2 permits despite deficiencies, documents show," pointed out that PDEP had

---

[3]    https://stateimpact.npr.org/pennsylvania/2016/09/15/dep-rejects-sunocos-plan-to-protect-water-ways-along-mariner-east-2-pipeline/ (last visited December 6, 2019).

[4]    https://stateimpact.npr.org/pennsylvania/2017/02/13/dep-approves-mariner-east-2-permits/ (last visited December 6, 2019).

approved the construction permits even though the Company had not yet met all necessary regulatory requirements, stating the following:

> Pennsylvania's Department of Environmental Protection issued final permits for the Mariner East 2 pipeline even though the pipeline's builder, Sunoco Logistics, had not met all regulatory requirements at the time of issuance, DEP documents show.
>
> The state's top environmental regulator acknowledged that the company's applications for permits on water crossings and soil disturbance contained many "deficiencies," but gave the multi-billion dollar project a green light anyway, according to the documents obtained by StateImpact.
>
> * * *
>
> "The Bureau explained that minimum standards have been met and many remaining identified deficiencies are not required to be addressed for permit issuance," said the document, dated Feb. 10, three days before the permits were issued. "Therefore, at the direction of the Bureau, special conditions have been drafted to address the outstanding items."

120.    An additional NPR article published on September 25, 2018, titled, "Mariner East 2: Sunoco's incidents, fines and shutdowns fuel residents' safety concerns" described myriad fines and shutdowns imposed by PDEP and other Pennsylvania authorities over the course of the construction of the Mariner East Pipeline, including a $12.6 million penalty levied against Sunoco for "egregious" violations. The article stated, in relevant part, the following:[5]

> Critics of the project say Sunoco has paid little heed to the fines and shutdowns handed out by Pennsylvania regulators. They note that the company has continued to spill drilling fluid into waterways, prompting the Department of Environmental Protection to issue dozens of violations, as recently as Sept. 18, despite the agency's $12.6 million penalty and permit suspension earlier this year for what it called "egregious" violations.
>
> * * *
>
> Data from the Pipeline and Hazardous Materials Safety Administration show Sunoco Pipeline reported 302 incidents from its pipelines carrying hazardous liquids such as crude oil or petroleum products nationwide from 2006 to 2018,

---

[5]    https://stateimpact.npr.org/pennsylvania/2018/09/25/mariner-east-2s-incidents-fines-and-shutdowns-fuel-residents-safety-concerns/ (last visited December 6, 2019).

year-to-date. That was the second-most among 2,152 operators in the agency's database after Enterprise Crude Pipeline, a carrier of crude oil, which reported 306 incidents. Sunoco also had 175 federal inspections and 37 enforcement actions during the period.

121.    Subsequently, in December 2018, Mariner East 2 commenced operations in Pennsylvania.

122.    On April 4, 2019, the Guardian published an article titled, "Pennsylvania governor under scrutiny for role in approving pipeline," which detailed suspicious activity at a PDEP office, including between the Secretary of PDEP and the then-CEO of Sunaco, Michael Hennigan, shortly before the Mariner East 2 permits were approved.[6] The article, which contained information based on internal governmental records obtained by the Guardian, stated the following, in relevant part:

> ***Emails, text messages and regulatory records show that the secretary of Pennsylvania's department of environmental protection (DEP), Patrick McDonnell, directed staff to cut short their environmental review even as numerous shortcomings remained in the project's permit application. The department also appeared to be under pressure from Wolf's office at the time.***
>
> ***DEP staff internally circulated two "deficiency letters" on 20 January 2017 that they were preparing to send to an ETP subsidiary, Sunoco Logistics***, citing inadequacies in the company's plans concerning earth disturbance activities and drilling beneath water bodies.
>
> Five days later, a senior official in Wolf's office, Yesenia Bane, texted McDonnell to request the agency refrain from sending a deficiency letter, pending a meeting involving Wolf, the governor's chief of staff, and McDonnell.
>
> "Understood," McDonnell wrote in response. Less than an hour later, McDonnell emailed several staff members involved in the pipeline review that "Govs [sic] office needs a list of the outstanding issues ASAP".
>
> ***Roughly two weeks after that, the DEP approved the pipeline without requiring many of the environmental safeguards it had initially sought***. A DEP senior official who was involved in the Mariner East 2 project, John Stefanko, noted in

---

[6] https://www.theguardian.com/us-news/2019/apr/08/pennsylvania-governor-pipeline-tom-wolf-permits (last visited March 24, 2020).

a later legal deposition that McDonnell had directed staff "that we needed to make a decision by February 10th", although the review had been scheduled to persist for at least several additional months.

> ***The text messages and a handwritten note from a DEP staff member show that the then CEO of Sunoco, Mike Hennigan, regularly talked to McDonnell in the lead-up to the permit authorization, and that McDonnell reported to the governor's staff on those conversations.*** "If I need to talk to Mike five times a day, that's what we will do," McDonnell wrote to Bane.

(Emphasis added.)

### <u>False and Misleading Statements</u>

#### *February 24, 2017 Form 10-K*

123.    During after-market hours on February 24, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Warren, Long, McReynolds, McCrea, Ramsey, Brannon, Turner, and Williams, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McReynolds and Long attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

124.    The 2016 10-K emphasized the Company's extensive corporate governance, stating that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board."

125.    The 2016 10-K further noted that "[s]pecific provisions [of the Company's corporate governance] are applicable to the principal executive officer, principal financial

officer, principal accounting officer and controller, or those persons performing similar functions, of our General Partner." The 2016 10-K directed the investing public to the Company's Code of Conduct by stating, "[c]urrent copies of [the Partnership's] Code of Business Conduct and Ethics . . . are available on [the Company's] website."

126.   The 2016 10-K also stated that the Company believed that it had valid title to all of its properties, and that the Company had obtained or was in the process of obtaining all necessary permits and authorizations for its properties, including its pipelines. The 2016 10-K stated the following:

> ***We believe that we have satisfactory title to or valid rights to use all of our material properties***. Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole. ***In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business***.

> Substantially all of our subsidiaries' pipelines, which are described in "Item 1. Business" are constructed on rights-of-way granted by the apparent record owners of the property. Lands over which pipeline rights-of-way have been obtained may be subject to prior liens that have not been subordinated to the right-of-way grants. Our subsidiaries have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our subsidiaries' pipelines were built were purchased in fee. ETP also owns and operates multiple natural gas and NGL storage facilities and owns or leases other processing, treating and conditioning facilities in connection with its midstream operations.

(Emphasis added.)

127.   The 2016 10-K also specifically referenced the Mariner East Pipeline as follows:

*NGL Pipelines*

Sunoco Logistics owns approximately 900 miles of NGLs pipelines, primarily related to the Mariner systems in the northeast and southwest United States.

- The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including our Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the third quarter of 2017.

\* \* \*

*NGLs Terminals*

\* \* \*

- *Marcus Hook Industrial Complex.* In 2013, Sunoco Logistics acquired Sunoco, Inc.'s Marcus Hook Industrial Complex. The acquisition included terminalling and storage assets, with a capacity of approximately 3 million barrels of NGL storage capacity in underground caverns, and related commercial agreements. The facility can receive NGLs via marine vessel, pipeline, truck and rail, and can deliver via marine vessel, pipeline and truck. In addition to providing NGLs storage and terminalling services to both affiliates and third-party customers, the Marcus Hook Industrial Complex currently serves as an off-take outlet for the Mariner East 1 pipeline, and will provide similar off-take capabilities for the Mariner East 2 pipeline when it commences operations.

128.   With respect to the Company's internal controls, the 2016 10-K stated the following, in relevant part:

The management of Energy Transfer Equity, L.P. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including the President and Group Chief Financial Officer of our General Partner, we conducted an evaluation of the effectiveness of our internal control over financial

reporting based on the framework in the 2013 *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").

Based on our evaluation under the COSO framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2016.

129.    With respect to changes in the Company's internal controls, the 2016 10-K further stated, "[t]here has been no change in our internal controls over financial reporting (as defined in Rules 13a–15(f) or Rule 15d–15(f)) that occurred in the three months ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting."

### *February 23, 2018 Form 10-K*

130.    On February 23, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Warren, Long, McReynolds, McCrea, Ramsey, Brannon, Turner, and Williams, and contained SOX certifications signed by Defendants McReynolds and Long attesting to the accuracy of the 2017 10-K.

131.    The 2017 10-K made the same representations pertaining to Energy Transfer's corporate governance as outlined in the 2016 10-K and referenced in the Company's Code of Conduct, stating the following:

The Board of Directors has adopted a Code of Business Conduct and Ethics applicable to our officers, directors and employees. Specific provisions are applicable to the principal executive officer, principal financial officer, principal accounting officer and controller, or those persons performing similar functions, of our general partner.

132.    The 2017 10-K made substantively the same representations as those made in the

2016 10-K regarding the validity of the Company's title and rights to its properties, stating the

following:

> *We believe that we have satisfactory title to or valid rights to use all of our material properties*. Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole. *In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business*.
>
> Substantially all of our subsidiaries' pipelines, which are described in "Item 1. Business," are constructed on rights-of-way granted by the apparent record owners of the property. Lands over which pipeline rights-of-way have been obtained may be subject to prior liens that have not been subordinated to the right-of-way grants. Our subsidiaries have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our subsidiaries' pipelines were built were purchased in fee. ETP also owns and operates multiple natural gas and NGL storage facilities and owns or leases other processing, treating and conditioning facilities in connection with its midstream operations.

(Emphasis added.)

133.    The 2017 10-K also specifically referenced the Mariner East Pipeline as follows:

The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including ETP's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345 MBbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the second quarter of 2018.

134.    With respect to the Company's internal controls, the 2017 10-K stated the following, in relevant part:

> The management of Energy Transfer Equity, L.P. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including the President and Group Chief Financial Officer of our General Partner, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in the 2013 *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").
>
> Based on our evaluation under the COSO framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2017.

135.    With respect to changes in the Company's internal controls, the 2017 10-K further stated, "[t]here has been no change in our internal controls over financial reporting (as defined in Rules 13a–15(f) or Rule 15d–15(f)) that occurred in the three months ended December 31, 2017 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting."

***May 3, 2018 Press Release***

136.    On May 3, 2018, the Company issued a press release titled, "Mariner East 1 Released for Service by Pennsylvania Public Utility Commission." The press release discussed the purported benefits of the Mariner East Pipeline, and announced a positive report from the Pennsylvania Public Utility Commission regarding the safety and integrity of the pipeline, stating the following:

> DALLAS--(BUSINESS WIRE)--May 3, 2018-- Energy Transfer Partners, L.P. (NYSE: ETP) announced today that its subsidiary, Sunoco Pipeline L.P. (SPLP), received a unanimous vote from the Pennsylvania Public Utility Commission (PUC) to resume operations of its Mariner East 1 pipeline. SPLP has worked diligently with the PUC's I&E Division and their outside experts on

the matter for several weeks and is pleased that all investigations concur regarding the safety and integrity of the pipeline. The procedures to resume public utility service on the pipeline will begin immediately.

Mariner East 1 is a major transporter of propane in Pennsylvania, which is ultimately delivered to local communities, providing affordable fuel to heat homes and run businesses. When Mariner East 1 was shut-in as a precautionary measure, there were no issues with the pipeline, which has been safely operating for decades. Its continued safe operation has now been verified by all parties.

Mariner East 1 is part of a larger public utility system including the Mariner East 2 and Mariner East 2X pipelines, which are currently under construction. Mariner East 2 mainline construction is 98% complete and 93% of the HDDs are either complete, in-progress or have been released for restart. Mariner East 2 is a critical energy infrastructure project, not only for Pennsylvania's economy, but for the thousands of people it puts to work every day. The total potential economic impact from all Mariner East construction in Pennsylvania is estimated to be more than $9 billion, supporting approximately 9,500 total jobs each year over six years of construction, with estimated wages of nearly $3 billion. These projects provide an economic boost in the 17 counties where they are located and across the entire Commonwealth.

***December 29, 2018 Press Release***

137.    On December 29, 2018, the Company issued a press release titled, "Energy Transfer Announces Mariner East 2 Pipeline is in Service," which boasted of the purported benefits Mariner East 2 would provide, stating the following, in relevant part:

DALLAS--(BUSINESS WIRE)--Dec. 29, 2018-- Energy Transfer LP (NYSE: ET) announced that effective today its Mariner East 2 natural gas liquids (NGLs) pipeline is in service, available for both interstate and intrastate service. The 350-mile NGL pipeline transports domestically produced ethane, propane and butane east from processing plants in Ohio across West Virginia and Pennsylvania to Energy Transfer's Marcus Hook Industrial Complex in Delaware County, PA, where the NGLs are stored for distribution to local, domestic and waterborne markets.

Mariner East 2 is part of Energy Transfer's Mariner East system of pipelines designed to provide much-needed NGL takeaway capacity for the Marcellus and Utica Shale production areas in Eastern Ohio, West Virginia and Western Pennsylvania. The Mariner East 2X pipeline, which parallels Mariner East 2, is expected to be in service in late 2019. The Mariner East system will provide both operational flexibility and enhanced security of NGL supply from producing areas to key markets in the region and beyond.

According to a 2015 economic impact study by EConsult Solutions, the total impact from the construction of the Mariner East pipelines is estimated to be more than $9.1 billion in Pennsylvania alone. When complete, the projects will have provided more than 9,500 construction jobs per year for six years, with associated earnings totaling more than $2.7 billion.

***February 22, 2019 Form 10-K***

138.    On February 22, 2019, the Company filed the 2018 10-K with the SEC. The 2018 10-K was signed by Defendants Warren, Long, McReynolds, McCrea, Ramsey, Anderson, Brannon, Davis, and Grimm, as well as non-party A. Troy Sturrock, and contained SOX certifications signed by Defendants Warren and Long attesting to the accuracy of the 2018 10-K.

139.    The 2018 10-K made the same representations pertaining to Energy Transfer's corporate governance as outlined in the 2016 and 2017 10-K, and referenced the Company's Code of Conduct as follows:

> The Board of Directors has adopted a Code of Business Conduct and Ethics applicable to our officers, directors and employees. Specific provisions are applicable to the principal executive officer, principal financial officer, principal accounting officer and controller, or those persons performing similar functions, of our general partner.

140.    The 2018 10-K made substantively the same representations as those made in the 2016 and 2017 10-K regarding the validity of the Company's title and rights to its properties, stating the following:

> ***We believe that we have satisfactory title to or valid rights to use all of our material properties***. Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole. ***In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required***

*material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business*.

Substantially all of our pipelines, which are described in "Item 1. Business," are constructed on rights-of-way granted by the apparent record owners of the property. Lands over which pipeline rights-of-way have been obtained may be subject to prior liens that have not been subordinated to the right-of-way grants. We have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our pipelines were built were purchased in fee. We also own and operate multiple natural gas and NGL storage facilities and own or lease other processing, treating and conditioning facilities in connection with our midstream operations.

(Emphasis added.)

141.    The 2018 10-K also specifically referenced the Mariner East Pipeline as follows:

The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including our Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, began service in December 2018.

142.    With respect to the Company's internal controls, the 2018 10-K stated the

following, in relevant part:

The management of Energy Transfer LP and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer of our General Partner, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in the 2013 *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").

Based on our evaluation under the COSO framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2018.

143.    With respect to changes in the Company's internal controls, the 2018 10-K further stated, "[t]here has been no change in our internal controls over financial reporting (as defined in Rules 13a–15(f) or Rule 15d–15(f)) that occurred in the three months ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting."

### *April 23, 2019 Press Release*

144.    On April 23, 2019, the Company issued a press release titled, "Energy Transfer Announces Mariner East 1 Pipeline is Back in Service," which announced that Mariner East 1 had resumed operations after an investigation into the structural integrity of the pipeline, stating the following:

> DALLAS--(BUSINESS WIRE)--Apr. 23, 2019-- Energy Transfer LP (NYSE: ET) announced that effective today, Mariner East 1 pipeline has resumed operations. The 350-mile, 8-inch natural gas liquids (NGL) pipeline transports NGLs across Southern Pennsylvania to Energy Transfer's Marcus Hook Industrial Complex in Delaware County, PA.

> Energy Transfer worked closely with the Pennsylvania Public Utility Commission Bureau of Investigation and Enforcement (BI&E) throughout an extensive three-month investigation, through which Energy Transfer confirmed the integrity of the pipeline in the area of West Whiteland Township, Chester County, PA. The investigation also confirmed that at no time was Mariner East 1 ever destabilized in this area.

> Mariner East 1 is part of Energy Transfer's Mariner East system of pipelines designed to provide much-needed NGL takeaway capacity for the Marcellus and Utica Shale production areas in Eastern Ohio, West Virginia and Western Pennsylvania.

145.    The statements in ¶¶ 123–144 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the General Partner and the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the

investing public that failed to disclose, *inter alia*, that: (1) the construction permits issued by PDEP in connection with the Mariner East Pipeline were obtained by the Company through the use of coercion, bribery, or other improper methods; (2) the use of these illicit methods increased the risk that the Company would be subjected to material investigations and/or litigation commenced by government authorities; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

146.    On November 12, 2019, the *Associated Press* published the AP Report. The AP Report revealed to the public that the FBI had begun a corruption investigation into Governor Wolf's administration in connection with the Mariner East 2 permits, stating the following:

> HARRISBURG, Pa. (AP) — The FBI has begun a corruption investigation into how Gov. Tom Wolf's administration came to issue permits for construction on a multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania, The Associated Press has learned.
>
> FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning.
>
> All three spoke on condition of anonymity because they said they could not speak publicly about the investigation.
>
> The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say.
>
> The Mariner East pipelines are owned by Texas-based Energy Transfer LP, a multibillion-dollar firm that owns sprawling interests in oil and gas pipelines and storage and processing facilities. At a price tag of nearly $3 billion, it is one of the largest construction projects, if not the largest, in Pennsylvania history.
>
> However, the construction has spurred millions of dollars in fines, several temporary shutdown orders, lawsuits, protests and investigations. When

construction permits were approved in 2017, environmental advocacy groups accused Wolf's administration of pushing through incomplete permits that violated the law.

147.    On this news, the price of Energy Transfer's units dropped by approximately 6.77% over the course of the next two trading sessions, from $11.97 per unit at the close of trading on November 11, 2019, to $11.16 per unit at the close of trading on November 13, 2019.

148.    On November 13, 2019, the Allegheny Front published an article commenting on the AP Report and the implications of the FBI's investigation, stating the following:

> Mariner East 2 went into service in December 2018. It has a long track record of drilling mud spills, fines and regulatory shutdowns. As of August, the Department of Environmental protection had entered into several consent orders and agreements with the company resulting from permit violations, and issued just under 100 separate notices of violations resulting in more than $13 million in penalties.
>
> * * *
>
> Rich Raiders, an eminent domain attorney who has represented landowners fighting the pipeline, called the FBI's investigation a "major development." He said people have been concerned that "political actors" got involved in the permitting process.
>
> "The fact that the FBI is involving itself in this matter tells me that a lot of the questions the citizens have been raising over time have some merit or potentially have some merit," Raiders said. "The permitting process seemed to be unusual in that the questions being asked by the agency in the late 2016 deficiency letters never seemed to get answered."

149.    On January 27, 2020, the Guardian published an article commenting on the current state of affairs regarding the Mariner East Pipeline and the FBI's investigation, and further highlighting the dubiousness of the permit approvals in light of the controversies and misconduct surrounding the pipeline.[7] The article stated the following, in relevant part:

> Sam Rubin, from Food and Water Watch, said: "There have been questions about the quality of the permits since they were granted in 2014 … there is a

---

[7]    https://www.theguardian.com/us-news/2020/jan/27/pennsylvania-residents-mariner-east-pipelines-drinking-water-contamination (last visited March 24, 2020).

pattern of malfeasance that is established and known which was overlooked when permits were granted by the DEP and Wolf administration."

* * *

Still, the project is also subject to criminal and civil investigations, which include:

- A FBI corruption investigation into Wolf's administration handling of the permit process.

- State and county investigations into alleged corruption, criminal misconduct and environmental crimes.

- At the end of 2019, security personnel working with Energy Transfer were charged with bribery and criminal conspiracy for allegedly recruiting, hiring, and hiding payments to state police officers. The company says the charges have no merit.

- A homeowner is suing Sunoco, claiming its drilling punctured the aquifer supplying his water well and led to E coli contamination that made him ill[.]

- Residents who live close to the pipeline – known as the Safety Seven – have an ongoing case with the regulator, the PUC, to shut down the project on the grounds it poses unacceptable safety risks, and the company has failed to develop a credible evacuation plan.

## DAMAGES TO ENERGY TRANSFER

150.    As a direct and proximate result of the General Partner and the Individual Defendants' conduct, Energy Transfer will lose and expend many millions of dollars.

151.    These expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152.    These expenditures also include, but are not limited to, any fees associated with the FBI's corruption investigation, and any other governmental, regulatory, or criminal investigations initiated in connection with the Mariner East Pipeline construction permits.

153.   As a direct and proximate result of the General Partner and the Individual Defendants' conduct, Energy Transfer has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

154.   Plaintiff brings this action derivatively and for the benefit of Energy Transfer to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as general partner and directors and/or officers of Energy Transfer, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof.

155.   Energy Transfer is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156.   Plaintiff is, and has been at all relevant times, a unitholder of Energy Transfer. Plaintiff will adequately and fairly represent the interests of Energy Transfer in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

157.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

158.   A pre-suit demand on the General Partner is futile and, therefore, excused. Demand is excused as to the General Partner because Defendant LE GP faces a significant likelihood of liability as a result of its knowing engagement in the scheme to allow the

Company to utilize permits that were obtained through the use of coercion, bribery, or other improper methods, and to cause the Company to make false and misleading statements and omissions of material fact to the investors and the general public that falsely represented the Company's performance and value. As the primary controller and beneficiary of the above-alleged scheme, the General Partner benefited at the expense of the Company. As the General Partner breached its fiduciary duties to the Company, it faces a substantial likelihood of liability, and it is not independent or disinterested, and thus demand on the General Partner is futile.

159.   Additionally, as the Company admitted in its 2019 10-K, the General Partner and its affiliates have conflicts of interests, which may cause them to favor their own interests to the detriment of the Company and its unitholders. The 2019 10-K stated the following:

> Conflicts of interest may arise among our general partner and its affiliates, on the one hand, and us, on the other hand. As a result of these conflicts, our general partner may favor its own interests and the interests of its affiliates over our interests.

160.   As a result of the foregoing, the General Partner breached its fiduciary duties, faces a substantial likelihood of liability in this Action, is not disinterested, and demand upon it is futile, and thus excused.

161.   Additional reasons that demand on the General Partner is futile follow.

162.   First, all of the directors on the Board of the General Partner have fiduciary duties to the General Partner, and in controlling the General Partner, they would cause it not to consider a demand fairly because granting the demand would damage it.

163.   Second, the majority of the Board of the General Partner is not independent or disinterested, as each of them either knowingly or recklessly participated in the conduct alleged herein, in complete abdication of their fiduciary duties to the Company, which renders them

unable to impartially investigate the charges and decide whether to pursue action against themselves and the General Partner. At the time of filing of this action, the Board of directors of the General Partner consisted of Defendants Warren, Long, McReynolds, McCrea, Ramsey, Anderson, Brannon, Davis, Grimm, and Washburne (the "Director-Defendants"), along with non-party James R. (Rick) Perry (together, the "Directors").

164.   Additional reasons that Defendant Warren is not independent or disinterested follow. Defendant Warren is a co-founder of the Company, and has served as the General Partner's Chairman and CEO since 2007. He is also the majority owner of the General Partner. Thus, as the Company admits, he is a non-independent director. Defendant Warren was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, all of which he signed or authorized the signing of. As the General Partner's highest officer and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Warren is a defendant in the Securities Class Action. For these reasons, Defendant Warren breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

165.   Additional reasons that Defendant Long is not independent or disinterested follow. Defendant Long has served as the General Partner's CFO since February 2016, and has served as a director of the General Partner since April 2019. Thus, as the Company admits, he is

a non-independent director. The General Partner provides Defendant Long with his principal occupation, and he receives handsome compensation, including $6,609,967 in 2018 and $4,845,208 in 2019 for his services. As such, Defendant Long is beholden to the General Partner. As the General Partner's CFO and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Long signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. Moreover, Defendant Long is a defendant in the Securities Class Action. For these reasons, Defendant Long breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

166. Additional reasons that Defendant McReynolds is not independent or disinterested follow. Defendant McReynolds served as the President of the General Partner from March 2005 until October 2018, on which date he became Special Advisor to the General Partner. He has also served as a director of the General Partner since August 2005. Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant McReynolds with his principal occupation, and he receives handsome compensation, including $1,422,273 in 2018 for his services. As such, Defendant McReynolds is beholden to the General Partner. As the General Partner's President and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McReynolds signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. Moreover, Defendant McReynolds is a defendant in the Securities Class Action. For these reasons, Defendant McReynolds breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

167. Additional reasons that Defendant McCrea is not independent or disinterested follow. Defendant McCrea has served as the President and CCO of the General Partner since October 2018, and has served as a director of the General Partner since December 2009. Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant McCrea with his principal occupation, and he receives handsome compensation, including $10,780,120 in 2018 and $11,601,341 in 2019 for his services. As such, Defendant McCrea is beholden to the General Partner. As the General Partner's President and CCO, and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McCrea signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. For these reasons, Defendant McCrea breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

168.   Additional reasons that Defendant Ramsey is not independent or disinterested follow. Defendant Ramsey has served as the COO of the General Partner since October 2018, and has served as a director of the General Partner since July 2012. Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant Ramsey with his principal occupation, and he receives handsome compensation, including $4,400,195 in 2018 and $4,715,743 in 2019 for his services. As such, Defendant Ramsey is beholden to the General Partner. As the General Partner's COO and as a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ramsey signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. For these reasons, Defendant Ramsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

169.   Additional reasons that Defendant Anderson is not independent or disinterested follow. Defendant Anderson has served as a director of the General Partner since June 2018. Defendant Anderson has received and continues to receive compensation for his roles with the Company as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of

coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Anderson signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

170. Additional reasons that Defendant Brannon is not independent or disinterested follow. Defendant Brannon has served as a director of the General Partner since March 2016. Defendant Brannon has received and continues to receive compensation for his roles with the Company as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Brannon signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. For these reasons, Defendant Brannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

171. Additional reasons that Defendant Davis is not independent or disinterested follow. Defendant Davis is a co-founder of the Company, and has served as a director of the General Partner since July 2018. Defendant Davis has received and continues to receive compensation for his roles with the Company as described above. As a trusted Director, he

conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Davis signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

172.   Additional reasons that Defendant Grimm is not independent or disinterested follow. Defendant Grimm has served as a director of the General Partner since October 2018. Defendant Grimm has received and continues to receive compensation for his roles with the Company as described above. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Grimm signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Grimm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

173.   Additional reasons that Defendant Washburne is not independent or disinterested follow. Defendant Washburne has served as a director of the General Partner since April 2019. As a trusted Director, he conducted little, if any, oversight of the scheme to allow the Company

to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Washburne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

174.   Additional reasons that the Director-Defendants are not independent or disinterested follow.

175.   The Directors-Defendants control the General Partner and have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently.

176.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and are not independent or disinterested.

177.   In violation of the Code of Ethics, Defendants Warren and Long conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the scheme to allow the Company to make use of permits that were obtained

through the use of coercion, bribery, or other improper methods, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Ethics, Defendants Warren and Long failed to comply with the law. Thus, Defendants Warren and Long face a substantial likelihood of liability and are not independent or disinterested.

178.    Energy Transfer has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Energy Transfer any part of the damages Energy Transfer suffered and will continue to suffer thereby. Thus, any demand upon the General Partner would be futile.

179.    The Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's Partnership Agreement (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to cause the General Partner to pursue this action on behalf of the unitholders of the Company.

180.    The acts complained of herein constitute violations of fiduciary duties owed by the General Partner and its officers and directors, and these acts are incapable of ratification.

181.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the unitholders of Energy Transfer. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to cause the General Partner to sue themselves or certain of the officers of the General Partner, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to cause the General Partner to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the General Partner is futile and, therefore, excused.

182.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause General Partner to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

183.    Thus, for all of the reasons set forth above, the General Partner cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the General Partner is excused as futile.

## FIRST CLAIM

### Against Defendants for Breach of Fiduciary Duties

184.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.    Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Energy Transfer's business and affairs.

186.    Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

187.    Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Energy Transfer.

188.    In breach of their fiduciary duties owed to Energy Transfer, Defendants willfully or recklessly caused the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and make false and misleading statements and omissions of material fact that failed to disclose that: (1) the construction permits issued by PDEP in connection with the Mariner East Pipeline were obtained by the Company through the use of coercion, bribery, or other improper methods; (2) the use of these illicit methods increased the risk that the Company would be subjected to material investigations and/or litigation commenced by government authorities; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times .

189.    Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

190.    Also in breach of their fiduciary duties, Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

191.    Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Energy Transfer's units and benefitting third parties.

192.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

193.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Energy Transfer has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

194.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants for Unjust Enrichment

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Energy Transfer.

197.    The Defendants either benefitted financially from the improper conduct, including from the receipt of bonuses, unit options, or similar compensation from the General

Partner that was tied to the performance or artificially inflated valuation of Energy Transfer, or received compensation that was unjust in light of the Defendants' bad faith conduct.

198.    Plaintiff, as a unitholder and a representative of Energy Transfer, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

199.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## THIRD CLAIM

### Against Defendants for Abuse of Control

200.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Energy Transfer, for which they are legally responsible.

202.    As a direct and proximate result of Defendants' abuse of control, Energy Transfer has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Energy Transfer has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

203.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants for Gross Mismanagement

204.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.    By its actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Energy Transfer in a manner consistent with the operations of a limited partnership.

206.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Energy Transfer has sustained and will continue to sustain significant damages.

207.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

208.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants for Waste of Corporate Assets

209.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public unitholders, Defendants have caused Energy Transfer to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

211.    As a result of the waste of corporate assets, the Defendants are each liable to the Company.

212.    Plaintiff on behalf of Energy Transfer has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Energy Transfer, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Defendants have breached their fiduciary duties to Energy Transfer;

(c)    Determining and awarding to Energy Transfer the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Energy Transfer and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Energy Transfer and its unitholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for unitholder vote the following resolutions for amendments to the Company's Partnership Agreement and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen Defendant LE GP's Board's supervision of operations and develop and implement procedures for greater unitholder input into the policies and guidelines of the Board;

2. a provision to permit the unitholders of Energy Transfer to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Energy Transfer restitution from Defendants, and each of

them;

       (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: March 25, 2020            Respectfully submitted,

                             **STECKLER GRESHAM COCHRAN PLLC**

                             */s/ R. Dean Gresham*

                             R. Dean Gresham
                             State Bar No.: 24027215
                             12720 Hillcrest Road, Suite 1045
                             Dallas, Texas 75230
                             Telephone: (972) 387-4040
                             Facsimile: (972) 387-4041
                             Email: dean@sgc.law

                             *Local Counsel for Plaintiff*

                             **PAWAR LAW GROUP, P.C.**
                             Vik Pawar
                             20 Vesey Street, Suite 1210
                             New York, NY 10007
                             Telephone: (212) 571-0805
                             Facsimile: (212) 571-0938
                             Email: vik@pawarlaw.com

                             *Counsel for Plaintiff*

## **VERIFICATION**

I, Barry King am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 3/23/2020 , 2020.

DocuSigned by:

Barry King

C65680B6D98D4D2...